UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN TYRONE HAIRSTON, | No. 2:23-cv-0900-CKD P |
| Plaintiff, | |
| v. | ORDER AND |
| R. ARCHIE, et al., | FINDINGS AND RECOMMENDATIONS |
| Defendants. | |

Plaintiff Kevin Hairston, a state prisoner, proceeds pro se with a civil rights action under 42 U.S.C. § 1983. Defendants' motion for summary judgment is before the court. (ECF No. 29.) The motion should be granted because plaintiff fails to raise a genuine issue of material fact for trial on his Eighth Amendment excessive force and deliberate indifference claims.[1]

**PROCEDURAL BACKGROUND**

Plaintiff filed the complaint on May 12, 2023. (ECF No. 1.) After the court's screening of the complaint required by 28 U.S.C. § 1915A(a), the case proceeded on his Eighth Amendment excessive force and deliberate indifference claims against defendants Archie and Schumann. (ECF No. 10.)

---

[1] In light of this determination, and in the interests of judicial economy, the court need not address defendants' alternate argument based on qualified immunity.

1

1       On January 3, 2025, defendants filed the motion for summary judgment presently before
2  the court. (ECF No. 29.) Defendants argue (1) plaintiff's Eighth Amendment excessive force
3  claims fail as a matter of law; (2) plaintiff's Eighth Amendment deliberate indifference claims fail
4  as a matter of law; and (3) defendants are entitled to qualified immunity. (Id. at 2.) Plaintiff
5  opposed the motion. (ECF No. 33.) Defendants filed a reply. (ECF No. 34.)

## LEGAL STANDARDS FOR SUMMARY JUDGMENT

7       Summary judgment is appropriate when the moving party shows there is "no genuine
8  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
9  Civ. P. 56(a). In order to obtain summary judgment, "[t]he moving party initially bears the burden
10 of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litig., 627
11 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The
12 moving party may accomplish this by "citing to particular parts of materials in the record,
13 including depositions, documents, electronically stored information, affidavits or declarations,
14 stipulations (including those made for purposes of the motion only), admission, interrogatory
15 answers, or other materials" or by showing that such materials "do not establish the absence or
16 presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to
17 support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

18      "Where the non-moving party bears the burden of proof at trial, the moving party need
19 only prove that there is an absence of evidence to support the non-moving party's case." Oracle
20 Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).
21 Summary judgment should be entered "after adequate time for discovery and upon motion,
22 against a party who fails to make a showing sufficient to establish the existence of an element
23 essential to that party's case, and on which that party will bear the burden of proof at trial."
24 Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the
25 nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

26      If the moving party meets its initial responsibility, the burden then shifts to the opposing
27 party to establish that a genuine issue as to any material fact does exist. Matsushita Elec. Indus.
28 Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the existence

of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson, 447 U.S. at 248.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

**EVIDENCE**

Plaintiff's opposition to the motion for summary judgment consists of a single sentence as follows: "This is my motion to oppose motion for defendant's motion for summary judgment."

3

(ECF No. 33.) Plaintiff's opposition does not cite any disputing competent evidence as required by Local Rule 260(b). (ECF No. 77 at 15-21.) Nevertheless, this court affords leniency to pro se litigants, particularly in civil rights cases. See, e.g., Wilhelm v. Rotman, 680 F.3d 1113, 1121 (9th Cir. 2012) (quoting Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir. 2010)). Accordingly, the court will consider the entire record, which includes plaintiff's complaint, signed under the penalty of perjury. The court considers the allegations therein as evidence in opposition to summary judgment to the extent they are based on plaintiff's personal knowledge of specific facts that are admissible. See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Lopez v. Smith, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000).

## I. Plaintiff's Verified Allegations[2]

Under the complaint's verified allegations, plaintiff was housed in a "one on one in cell 130 unit B7 crisbed[.]" (ECF No. 1 at 2.) Plaintiff was looking around his cell for anything to cut himself with or swallow, and found pieces of broken glass on the floor. (Id.) Plaintiff cut his left arm with the glass and was bleeding. (Id. at 3.) When defendant Schumann arrived at plaintiff's cell, plaintiff was still cutting himself. (Id.) Schumann said plaintiff should cut deeper if he really wanted to kill himself. (Id.) Defendant Schumann left and came back with other correctional staff including defendant Archie, who stated "you ain't dead yet." (Id.) Defendant Archie opened the tray slot and defendants Schumann and Archie sprayed pepper spray through it into plaintiff's face. (Id.)

## II. Undisputed Facts from Defendants' Evidence

In January 2023, Defendants Archie and Schumann regularly worked as Correctional Officers in the Facility B7 housing unit at California State Prison – Sacramento, where plaintiff was a prisoner. (UMF[3] Nos. 1, 2.) In January 2023, the Facility B-7 housing unit at California State Prison – Sacramento housed inmates including plaintiff who were assigned to Alternative

---

[2] Statements that are legal conclusions, speculative assertions, and statements of hearsay evidence do not satisfy the standards of personal knowledge, admissibility, and competence required by Federal Rule of Civil Procedure 56(c)(4). Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citations omitted).

[3] See Defendants' Statement of Undisputed Facts ("UMF") (ECF No. 29-1.)

Safe Housing Management ("ASHM"). (UMF Nos. 4, 7, 18.) Inmates placed in ASHM were monitored more regularly by staff to ensure their safety from self-injurious or suicidal behavior. (UMF Nos. 4, 5.) To prevent self-harm, inmates assigned to ASHM were restricted from possessing property that could be used for self-harm. (UMF 6.) On January 1, 2023, defendant Archie was assigned as a floor officer for the Facility B-7 housing unit and defendant Schumann was assigned as an escort officer for the same unit. (UMF Nos. 3.)

Correctional Officers working in the Facility B-7 housing unit were regularly tasked with supervising and responding to inmates who were experiencing mental health issues or exhibiting self-injurious or suicidal behavior. (UMF No. 8.) Entering an inmate's cell to restrain or escort the inmate often posed an excessive risk of danger to the safety of both correctional officers and the inmate because it could result in a violent confrontation. (UMF No. 9.) The standard procedure for escorting an inmate out of their cell in Facility B-7 was for correctional officers to first apply hand restraints to the inmate through the cell's food port while remaining outside of the inmate's cell. (UMF No. 10.)

In circumstances where an inmate presents an imminent threat of harm to themselves and the inmate does not understand or refuses to comply with orders, correctional officers were instructed to and authorized by CDCR's Department of Operations Manual, section 51020.15.3, to use chemical agents to gain control of the inmate and prevent the inmate from engaging in self-harm. (UMF Nos. 11, 14.) In such circumstances, use of chemical agents may be the safest or only viable option for both the inmate and the correctional officers to prevent the inmate from engaging in self-harm. (UMF No. 12.) In such circumstances, taking no action could pose a risk to the inmate from the inmate's self-injurious behavior. (UMF No. 13.)

On January 1, 2023, at approximately 11:00 a.m., Correctional Officer Camarena was conducting welfare checks on the inmates housed in the Facility B-7 housing unit. (UMF No. 15.) As Officer Camarena approached inmate Kevin Hairston's cell (cell 130), he noticed Hairston appeared to be in an agitated state. (UMF No. 17.) Hairston stated he was upset over not having access to his personal property while housed in his current cell. (UMF No. 19.) Hairston stated to Officer Camarena that he had swallowed glass and was cutting himself. (UMF No. 20.) Officer

Camarena immediately went to the program office and informed the officers there—including defendants Archie and Schumann—that Hairston appeared to be engaging in potential self-harm and claimed to have swallowed glass. (UMF Nos. 22, 23, 24.) In response to that report, defendants Archie and Schumann, along with Officers Camarena, Jones, and Trueblood, immediately went to Hairston's cell to escort him to the medical facility for medical evaluation and treatment. (UMF No. 25.) Defendants brought with them a safety triangle which is used during prisoner escorts. (UMF No. 26.)

Upon arriving at Hairston's cell, and in response to the staff report regarding Hairston swallowing glass, defendants Archie and Schumann issued several orders to Hairston to submit to restraints and exit his cell so that he could be escorted to the medical facility for medical evaluation and treatment. (UMF No. 28.) Hairston did not submit to restraints despite defendants' repeated orders. (UMF No. 29.)

While attempting to effectuate Hairston's escort to medical, defendants Archie and Schumann observed Hairston grab what they believed to be glass shards off the ground and heard him loudly yell that he intended to swallow more glass. (UMF Nos. 30, 31.) Defendant Schumann gave Hairston a direct order to put down his hands and relinquish the glass, with negative results. (UMF No. 32.)

Defendants Archie and Schumann observed Hairston begin to motion his hand towards his mouth in what appeared to be an attempt to harm himself by swallowing glass. (UMF No. 33.) To gain compliance with the defendants' orders and to prevent Hairston from engaging in self-harm, defendant Schumann sprayed Oleoresin Capsicum spray on Hairston through the cell's food port. (UMF No. 34.) Correctional Sergeant Trueblood used his state issued radio to call for a Code 1 emergency response summoning custody and medical staff to Hairston's cell. (UMF Nos. 35, 36.)

Following defendant Schumann's use of Oleoresin Capsicum spray, Schumann switched positions with defendant Archie, who was now in direct observation of Hairston. (UMF No. 37.) Hairston continued to pace around in his cell and refused to comply with defendants' further orders to submit to restraints, exit his cell, and receive escort to medical. (UMF Nos. 38, 61.) When Hairston motioned his hand to his face in what appeared to be another attempt at self-harm

1  by swallowing glass, defendant Schumann gave Hairston another direct order not to swallow the
2  glass in his hand. (UMF No. 39.) Hairston did not lower his hand. (UMF No. 40.) Defendant
3  Archie deployed a second burst of Oleoresin Capsicum spray on Hairston through the cell's food
4  port. (UMF No. 41.) Hairston then opened his hand and pulled it away from his face. (UMF No.
5  42.)
6       Officer Camarena switched position with defendant Archie and took up direct observation
7  of Hairston. (UMF No. 43.) Defendants Archie and Schumann left the incident location while
8  Officer Camarena maintained direct supervision on Hairston. (UMF No. 44.)
9       A registered nurse arrived and performed a "7219" medical examination on Hairston from
10 outside of the cell. (UMF No. 45.) Correctional Sergeant Trueblood offered Hairston the
11 opportunity to exit his cell to decontaminate from the effects of the Oleoresin Capsicum spray,
12 which Hairston refused. (UMF No. 46.)
13      The registered nurse gave Hairston instructions on how to self-decontaminate while
14 remaining in his cell using water from the cell sink. (UMF No. 47.) After self-decontaminating,
15 Hairston agreed to comply with orders to submit to restraints and exit his cell. (UMF No. 48.)
16 Hairston was secured in wrist and leg restraints and escorted to the medical facility. (UMF No.
17 49.)
18      At the time of the incident, the defendants determined that utilizing their pepper spray
19 through the food-port of Hairston's cell was their only safe option to stop what appeared to be his
20 self-harm attempt. (UMF No. 50.) Defendants determined that entering Hairston's cell would
21 present an excessive risk of harm to both them and Hairston. (UMF No. 53.) Hairston admits that
22 he frequently receives and pleads guilty to Rules Violation Reports while in prison, many of
23 which are for batteries on other prisoners and correctional officers. (UMF No. 57.)
24      Defendants Archie and Schumann each utilized one single burst of their pepper spray in
25 response to Hairston's self-harm attempts and used no other force during the incident. (UMF No.
26 59.) Hairston claims no injuries because of the incident aside from pain from his exposure to
27 pepper spray, which subsided within a few days' time. (UMF No. 60.)
28 ////

**DISCUSSION**

I.    **Excessive Force**

    A.    **Legal Standard**

The use of pepper spray can implicate a prisoner's Eighth Amendment right to be free from the use of excessive use of force. See Clement v. Gomez, 298 F.3d 898, 903-04 (9th Cir. 2002); DeSpain v. Uphoff, 264 F.3d 965, 978 (10th Cir. 2001). The core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillan, 503 U.S. 1, 7 (1992). The malicious and sadistic use of force to cause harm always violates contemporary standards of decency in violation of the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 327 (1986).

The court's inquiry into an excessive force claim focuses on the extent of the prisoner's injury, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. Hudson, 503 U.S. at 7. "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force causes should be granted sparingly." Avina v. United States, 681 F.3d 1127, 1130 (9th Cir. 2012) (citation omitted).

    B.    **Analysis**

Summary judgment is warranted because there is no genuine issue of material fact on plaintiff's excessive force claims. Viewing the record in the light most favorable to plaintiff, both defendant Schumann and defendant Archie deployed their pepper spray after plaintiff had cut himself, was bleeding, and stated he had swallowed glass. Defendants reasonably perceived a need for plaintiff needed to be promptly medically evaluated, but plaintiff was not complying with direct orders to put down the glass he was holding and submit to restraints to be escorted to receive medical evaluation and/or treatment.

The court affords prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to present internal order and

8

discipline and to maintain institutional security." See Bell v. Wolfish, 441 U.S. 520, 547 (1979). This applies to the prison's policy authorizing us of chemical agents to gain control of an inmate and/or prevent an inmate from engaging in self-harm when the inmate refuses to comply with direct orders. Plaintiff does not identify any arguably superior alternatives that defendants could have used in the situation confronted in this instance. Even if there were an arguably superior alternative to the use of pepper spray, "[t]he infliction of pain in the course of a prison security measure… does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Whitley, 475 U.S. at 319.

The undisputed evidence does not suggest either defendant intended any harm toward plaintiff other than the harm normally associated with pepper spray, which was reasonably deployed for the purpose of preventing harm or further harm to plaintiff from self-injurious behavior. No reasonable jury could find the defendants did not reasonably perceive an ongoing threat to plaintiff's own safety. The defendants attempted to temper the severity of their forceful response by giving plaintiff orders to put down the glass he was holding before deploying the force at issue, which is a factor tending to indicate the force was applied in a good-faith effort to maintain or restore discipline, rather than maliciously and sadistically to cause harm. See Williams v. Austen, No. 4:19-CV-06882 YGR, 2021 WL 4222079, at *6 (N.D. Cal. Sept. 16, 2021) (holding that a 40 mm. round was fired in a good-faith effort to restore order where neither verbal commands nor the use of chemical agent grenades had stopped the fight). Plaintiff did not comply with the orders, just as he had not complied with the initial orders to submit to restraints so that he could be taken to for medical evaluation.

Under plaintiff's verified allegations, the defendants made remarks to plaintiff that were arguably inappropriate. This evidence does not create a genuine issue of material fact for trial. "[I]nappropriateness does not equate with unconstitutionality, and verbal harassment does not violate the Eighth Amendment." Hoover v. Thomas, No. CV 09-1147-JE, 2011 WL 2619505, at *4 (D. Or. Apr. 1, 2011), report and recommendation adopted, No. 3:09-CV-1147-JE, 2011 WL 2610212 (D. Or. June 29, 2011) (citing Oltarzerski v. Ruggiero, 830 F.2d 136, 139 (9th Cir.

9

1  1987) and Austin v. Terhune, 367 F.3d 1167. 1171-72 (9th Cir. 2004)); see also Somers v.
2  Thurman, 109 F.3d 614, 622 (9th Cir. 1997) ("We are mindful of the realities of prison life, and
3  while we do not approve, we are fully aware that the exchange of verbal insults between inmates
4  and guards is a constant, daily ritual observed in this nation's prisons." (quotation marks and
5  citation omitted)).

6      Considering the relevant factors and looking at the relationship between the need for force
7  and the amount of force used, the force used by each defendant to deploy a short burst of pepper
8  spray was reasonable. There is no genuine issue of material fact for trial. Defendant's motion for
9  summary judgment should be granted as to plaintiff's excessive force claims.

10     **II.  Deliberate Indifference**
11         **A.  Legal Standard**

12  Denial or delay of medical care for a prisoner's serious medical needs may constitute a
13  violation of the prisoner's Eighth Amendment rights. Estelle v. Gamble, 429 U.S. 97, 104-05
14  (1976). An individual is liable for such a violation only when the individual is deliberately
15  indifferent to a prisoner's serious medical needs. Id.; see Jett v. Penner, 439 F.3d 1091, 1096 (9th
16  Cir. 2006); Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002); Lopez, 203 F.3d at 1131-32.

17     In the Ninth Circuit, the test for deliberate indifference consists of two parts. Jett, 439 F.3d
18  at 1096, citing McGuckin v. Smith, 974 F.2d 1050 (9th Cir. 1991), overruled on other grounds by
19  WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc). First, the plaintiff must
20  show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could
21  result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Id., citing
22  Estelle, 429 U.S. at 104. "Examples of serious medical needs include '[t]he existence of an injury
23  that a reasonable doctor or patient would find important and worthy of comment or treatment; the
24  presence of a medical condition that significantly affects an individual's daily activities; or the
25  existence of chronic and substantial pain.'" Lopez, 203 F. 3d at 1131-1132, citing McGuckin, 974
26  F.2d at 1059-60.

27     Second, the plaintiff must show the defendant's response to the need was deliberately
28  indifferent. Jett, 439 F.3d at 1096. This second prong is satisfied by showing (a) a purposeful act

or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Id. Under this standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). This "subjective approach" focuses only "on what a defendant's mental attitude actually was." Id. at 839.

Mere delay of medical treatment, "without more, is insufficient to state a claim of deliberate medical indifference." Shapley v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). When a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay caused "significant harm and that [d]efendants should have known this to be the case." Hallett, 296 F.3d at 745-46; see also McGuckin, 974 F.2d at 1060.

### B. Analysis

Defendants do not dispute that plaintiff had a serious medical need. The court therefore focuses on their responses to plaintiff's serious medical need. Viewing the evidence in the light most favorable to plaintiff, there is no evidence that either defendant Schumann or defendant Archie purposefully disregarded a substantial risk of serious harm to plaintiff through their action or inaction. See Farmer, 511 U.S. at 837. To the contrary, the undisputed evidence shows defendants made prompt and repeated efforts to escort plaintiff out of his cell for medical evaluation and treatment after being informed that plaintiff stated he had swallowed glass and was bleeding from cutting himself with glass. Plaintiff impeded those efforts by refusing to follow orders to submit to restraints and exit his cell. Plaintiff testified at his deposition that he did not comply with the orders because he did not want to be escorted by defendants Schumann and Archie. (ECF No. 29-3 at 86:24-25.) Had plaintiff complied with defendants' orders, the escort to the medical building would have taken five to ten minutes. (Id. at 86:16-20.)

There is no genuine issue of material fact for trial on the issue whether either defendant purposefully disregarding a substantial risk of serious harm to plaintiff by denying or delaying medical treatment. Defendants' motion for summary judgment should also be granted as to plaintiff's deliberate indifference claims.

## PLAIN LANGUAGE SUMMARY FOR PRO SE PARTY

The following information is meant to explain this order in plain English and is not intended as legal advice.

The court has reviewed the defendants' evidence and your verified allegations and concluded there is no genuine issue of material fact for trial. The undersigned is recommending the defendants' motion for summary judgment be granted. If you disagree, you have 14 days to explain why this is not the correct outcome. Label your explanation "Objections to Magistrate Judge's Findings and Recommendations." The district court judge assigned to your case will review any timely objections filed and make a final decision on the motion for summary judgment.

## ORDER AND RECOMMENDATION

For the reasons set forth above, IT IS ORDERED that the Clerk of the Court shall assign a district judge to this case.

In addition, IT IS RECOMMENDED as follows:

1. Defendants' motion for summary judgment (ECF No. 29) be GRANTED.
2. The Clerk of Court be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within 7 days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: June 26, 2025

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

8, hair0900.msj